DAVOUD RAKHSHAN, Plaintiff

v.

AMERICAN SAMOA GOVERNMENT, ATTORNEY GENERAL,
CHIEF IMMIGRATION OFFICER SO'OSO'O TUIOLEMOTU,
SUITUPU SEVA'AETASI, TA'AVILI ULUGAONO,
LUPE TAGOA'I and DOES I to X, Defendants

DAVOUD RAKHSHAN, Plaintiff

v.

AMERICAN SAMOA GOVERNMENT,
LBJ MEDICAL CENTER, DR. SALAMO LAUMOLI,
DON NOEL, and DOES I-X, in their Capacities as
LBJ EMPLOYEES and as PRIVATE INDIVIDUALS, Defendants

DAVOUD RAKHSHAN, Plaintiff

v.

AMERICAN SAMOA GOVERNMENT,
ATTORNEY GENERAL AVIATA FA'ALEVAO,
TAUIVI TUINEI, COUNSEL FOR IMMIGRATION BOARD,
JOHN FAUMUINA, CHAIRMAN OF THE IMMIGRATION
BOARD, TAESALIALI'I LUTU, MEMBERS OF THE BOARD
and DOES I to XX, and as PRIVATE INDIVIDUALS, Defendants

High Court of American Samoa
Trial Division

CA No. 20-90
CA No. 103-90
CA No. 109-90
(AP No. 14-91)

July 5, 1991

1

Before KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, Pro Se
 For Defendant, Arthur Ripley, Jr., Assistant Attorney
 General

These matters were consolidated for trial. Plaintiff, a national of Iran, first entered the territory under a temporary visitor's permit on May 3, 1987. He has been preoccupied ever since in striving to remain in the territory on a more permanent basis. The local immigration authorities, on the other hand, have been trying to deport him since mid-1988. In the process, plaintiff has been arrested several times and detained at the Tafuna Correctional Facilities pending deportation efforts.[1] His repeated encounters with the immigration authorities can be attributed in no small measure to his curious flair for readily making and unmaking friends. As a result, he has had a remarkably high turnover of sponsors.[2]

Filing suit pro se, plaintiff seeks, in CA No. 20-90 and CA No. 109-90, damages against the government and various immigration officials for alleged wrongful detainment; and in CA No. 103-90, damages against the government (hospital) and certain of its dental personnel for their alleged wrongful failure to hire him.

## FACTS

---

[1] These efforts have been stayed by the Appellate Division of the High Court, although not for reasons attributable to any particular merit in plaintiff's claim of entitlement to remain in the territory. See Rakhshan v. Immigration Board, 15 A.S.R.2d 29 (1990).

[2] A person who seeks to remain in American Samoa for any permissible extended length of time is required to have a local sponsor, who is, among other things, a guarantor of that person's public debts. See A.S.C.A. § 41.0408.

2

Plaintiff came to the territory via the Republic of the Philippines, where he had attended school and gained a dentistry degree. After he arrived, plaintiff quickly befriended the hospital's then-director of dental services, Dr. Salamo Laumoli, in hope of securing employment. They became close friends. However, after being on-island for some two months, plaintiff's expectations of employment had not materialized; at the same time, he was vaguely aware that his tourist status would lapse after 60 days.[3] He visited the Immigration Office on or about July 3, 1987, to inquire about extending his permit. He met with Chief Deputy Immigration Officer Robert Porter and informed him of pending employment with the hospital. Mr. Porter, in turn, advised plaintiff that government employment constituted permission to enter the territory but that plaintiff had to furnish proof of such employment.[4]

Faced with this need for proof, plaintiff turned to his friend Dr. Laumoli, who then produced a "To Whom It May Concern" letter in the name of "friendship." Dr. Laumoli testified that plaintiff not only requested the letter but also suggested its wording. The letter stated that the hospital "was in the process of hiring Dr. Davoud Rakhshan . . . as a general practitioner dentist" and sought such assistance as might "expedite [plaintiff's] permit to reside here in American Samoa." In fact, the letter flagrantly misrepresented the facts and (not surprisingly) has since become a sorry source of embarrassment for its author. (Not only did Dr. Laumoli lack the singular authority to hire plaintiff, but also plaintiff could not even have been hired as "a general practitioner dentist," since the Health Services Regulatory Board had not licensed him to practice dentistry in the territory, as mandated by statute. See A.S.C.A. §§ 31.1001 et seq. Indeed, Dr. Don Noel, a member of the Health Services Regulatory Board, testified that the board denied plaintiff's application for licensure because he failed to demonstrate qualification in accordance with applicable regulatory criteria.)

The letter, which plaintiff promptly delivered to Mr. Porter

---

[3] A tourist or business visitor may remain in the territory for a period of up to 30 days, however, such period may be extended for an additional 30 days upon approval of the Attorney General or his designee. See A.S.C.A. § 41.0502(a)(2)(D).

[4] Government employees are merely required to supply proof of government employment and assignment to the territory in order to enter. See A.S.C.A. § 41.0502(a)(5).

3

personally, served its intended purpose. The Chief Deputy Immigration Officer accepted its representations and took no further action--plaintiff, in reality an overstayer, had managed to avert otherwise-certain deportation. See A.S.C.A. § 41.0616(15). There was, of course, no government job in the pipeline, although plaintiff kept up the ruse by regularly asking Deputy Chief Porter whether the Immigration Office had received the paperwork relating to his employment. At the same time, plaintiff maintained the overt appearance of imminent employment at the hospital's dental clinic, where he was daily permitted to "observe."

After a few more months had passed, and probably because the ruse of government employment could not be indefinitely continued, Dr. Laumoli agreed to sponsor plaintiff and petition the Immigration Board to give him a work permit. Although the application[5] was dated September 27, 1987, it did not come before the board until March 11, 1988. Dr. Laumoli had by that time withdrawn his offer of sponsorship since he and plaintiff had by then parted company. Notwithstanding, plaintiff had also by that time obtained a new patron, and on May 6, 1988, the board granted him a conditional[6] work permit for one year under the sponsorship of a Mr. Lautaimi Talamaivao.

As soon as he obtained his permit, plaintiff again visited the Immigration Office to seek advice on how to change sponsors; this time, he was accompanied to the Immigration Office by a Mr. David Katina.[7]

---

[5] Dr. Laumoli also testified that he merely signed and dated the application form and it was plaintiff who filled out the details.

[6] The Board's Order stated in pertinent part: "Alien Rakshan [sic] is hereby authorized for employment, but only upon the showing that the job was advertised extensively and there is a shortage of employable qualified persons existing in American Samoa. A.S.C.A. § 41.0305(5). Such proof shall be submitted to the Immigration Department [sic] prior to actual employment."

[7] It is to be noted that the Act, A.S.C.A. § 41.0408(h), does not permit the transfer of sponsorship from one person to another absent some "compelling reason in the public interest of the people of American Samoa." Just what was the "compelling reason" in plaintiff's then-circumstances was not clear on the evidence. Plaintiff claims that he had to find another sponsor because Mr. Talamaivao was at the time leaving the territory indefinitely; on the other hand, Mr. Katina testified at a

4

The request, according to the testimony of Chief Immigration Officer So'oso'o Tuiolemotu, was referred to and approved by the Attorney General's Office.

Within a month plaintiff was in need of yet another sponsor. Mr. Katina complained to the Immigration Office that plaintiff was causing him trouble within his church and family and withdrew his sponsorship of plaintiff. Consequently, the Immigration Office gave plaintiff notice to depart the territory within ten days, as he was without a sponsor.[8]

Plaintiff, however, failed to depart the territory. As a result, he was subsequently taken into custody and detained at the Correctional Facilities pending deportation proceedings. He was arrested on July 12, 1988, but then released on July 16, 1988. The evidence was not very clear on the reason for plaintiff's release; however, Chief Deputy Immigration Officer Porter testified that he had received a call from Dr. Toeaso Tago (a relative of plaintiff's original sponsor, Mr. Talamaivao), who informed him that Mr. Talamaivao was returning to the territory and was willing to again sponsor plaintiff. Evidently, the matter was informally resolved with the return of Mr. Talamaivao, since deportation proceedings were discontinued and plaintiff ended up teaching at the Tafuna High School.

In the following year, as his permit was about to expire, plaintiff again went before the Immigration Board and requested another change in sponsor because Mr. Talamaivao was again departing the territory indefinitely.[9] At this time a Mr. Dave Save presented himself before the board as plaintiff's new prospective sponsor. The board, in its written decision dated June 30, 1989, denied this application and ordered plaintiff to depart the territory within ten days.

---

deportation proceeding before the Immigration Board that plaintiff had sought out his sponsorship after accusing Mr. Talamaivao of certain mistreatment.

[8] A.S.C.A. § 41.0408(i) provides that upon revocation of sponsorship, the person sponsored may remain in the territory for a period of up to ten days, unless the board earlier orders deportation.

[9] Indefinite departure of a person's sponsor is a ground for revoking that person's permit. See A.S.C.A. § 41.0408(f).

Plaintiff appealed to the Appellate Division after unsuccessfully petitioning the board for reconsideration. The Court granted plaintiff's application for a stay. See Rakhshan v. Immigration Board, 13 A.S.R.2d 25 (1989). Among other things, the Appellate Division found the record below to be inadequate for purposes of judicial review and remanded the matter back to the board for further hearing. The Court later observed, in Rakhshan v. Immigration Board, 15 A.S.R.2d 29, that the sketchy record produced suggested that the board could have deported plaintiff on a charge of "overstaying" because he had by then lost his teaching job; however, since it did not clearly articulate overstaying as a ground for deportation, that opportunity was only available to the board on rehearing as ordered. Id. at 31. As it turned out, the board never took that opportunity. Assistant Attorney General Tauivi Tuinei testified that instead he and plaintiff's then-counsel Charles Ala'ilima entered into settlement discussions about allowing plaintiff to depart voluntarily.[10] Tuinei also testified that he was under the impression from counsel that plaintiff was planning to travel to Australia and that he was, therefore, surprised when plaintiff visited him on or about January 3, 1990, and inquired about a date for the rehearing which the appellate court had ordered. Tuinei further testified that plaintiff denied having had any plans to depart the territory and that he later produced a tape of a secretly recorded conversation he had with Ala'ilima which he offered to discredit his (by then former) attorney. In the ensuing dialogue, Tuinei informed plaintiff that he would prepare to have him re-arrested, whereupon plaintiff quite literally took to the hills.

For almost two months, plaintiff eluded several search efforts; however, he was finally apprehended on February 28, 1990, pursuant to a warrant of arrest executed by Immigration Officers Herota Satele and Taufooua Asoau. The officers found plaintiff hiding out in the hills behind Futiga and Pava'ia'i; they arrested him and took him to the Tafuna Correctional Facility.

The application for the warrant, which was sworn to by Officer Satele, charged plaintiff with a number of violations of the Immigration Act, namely: overstaying, failing to furnish an annual report of address, failing to furnish a change in address, and being the subject of an

---

[10] There are significant practical differences between deportation and voluntary departure as defined in A.S.C.A. § 41.0601. For example, the former instance renders one an excludable person, see A.S.C.A. § 41.0615(14); i.e., further entry into the territory is effectively prohibited.

outstanding foreign warrant of arrest. On March 1, 1990, plaintiff was brought before the board to answer these charges. At this time he was represented by counsel Asaua Fuimaono. The board's record reveals that it first considered an application for bail set in the sum of $7,000, after being initially set at $10,000, and then took evidence over a two-day period. On March 23, 1990, the board issued its written decision which again ordered plaintiff deported.

On April 12, 1990, plaintiff filed his appeal to the Appellate Division and, at the same time, applied to stay execution of the deportation order and to be released upon surety in lieu of cash. The appellate court granted the application for release upon sufficient sureties and stayed only so much of the deportation order as required deportation to Iran as plaintiff's country of origin. See Rakhshan v. Immigration Board, 15 A.S.R.2d 29. The Appellate Division's file further reveals that on or about May 19, 1990, the immigration authorities attempted to enforce the board's order, as modified by the Court, by deporting plaintiff to the Republic of the Philippines as his country of origin. The flight on which plaintiff was booked to depart was significantly delayed; when it was finally ready to leave, plaintiff failed to show. He fled again. This time, plaintiff managed to hide for almost a month until he was physically extracted by immigration officials from the attic of a residence in Sogi, Leone, pursuant to a search warrant.

### DISCUSSION

These consolidated matters suffer a common feature--they border on the vexatious. If anything has been shown in these cases, it is that plaintiff confuses the court's "open doors" policy with something akin to an "open sesame" policy which commands access to judicial relief upon the mere ritualistic incantation of a few mystic phrases--"due process," "constitutional rights," "extreme emotional and mental anguish," "pain and suffering," etc. These phrases were but some of the jargon counsel Asaua Fuimaono used in preparing the original complaint in CA No. 20-90 and the administrative claim preceding CA No. 109-90. Fuimaono's friendship has since become another made-and-unmade friendship, which ultimately ended in a lawsuit.[11] However, after parting company with

---

[11] See Rakhshan v. Fuimaono, 18 A.S.R.2d 77 (Trial Div. 1991). Fuimaono here testified that he filed CA No. 20-90 largely as a tactical manoeuvre intended to gain leverage with the immigration authorities, in view of the deportation issue then facing plaintiff, and that the more he

7

Fuimaono, plaintiff continued to fashion pro se complaints by mindlessly parroting the jargon which counsel had employed in another context. The resulting "patchwork" nature of these complaints is unmistakable; therefore, the question which immediately arises is whether there are meritorious claims submitted.

## I. CA No. 109-90

This particular action, which required the defendants to defend a $1 million suit for "general" and "special" damages, is illustrative. The complaint here shamelessly depicts a haphazard effort at "cut and paste." Although mindful that a pro se complaint should be broadly construed in order to promote the interests of justice, see American Samoa Gov't v. Agasiva, 6 A.S.R.2d 32 (1987), we find that the complaint here says virtually next-to-nothing by way of noticing a claim upon which judicial relief may be framed. It recites, for instance (or more accurately, it lifts from another context), the timely filing of an administrative claim pursuant to the Government Tort Liability Act (hereinafter the "G.T.L.A."), whereas, in fact, nothing of the sort occurred.[12] But we are satisfied that this was not an attempt to deliberately mislead; instead, plaintiff was merely reproducing legal jargon from elsewhere without the slightest idea of what he was in fact doing. The complaint also mentions once (in conclusionary fashion) the word "negligence" as being the "proximate [cause]" of plaintiff's damages; but what comprised that negligence on the part of the defendants is neither to be gleaned from the complaint nor revealed, even remotely, on the evidence.[13] Additionally, the complaint, after quoting (inappropriately) from the Appellate Division's order entered May 4, 1990, in Rakhshan v. Immigration Board, 15 A.S.R.2d 29, further alleges that plaintiff's "constitutional rights" were being violated by his continued detention contrary to the terms of the said order, which

---

investigated the case, the more convinced he had become that neither the law nor the facts favored his client. Id. at 79.

[12] Such a claim is a jurisdictional prerequisite to any suit against the government pursuant to the provisions of the G.T.L.A., A.S.C.A. §§ 43.1201 et seq. Faoato v. Government of American Samoa, CA No. 36-79 (1979); Gobrait v. Americana Hotels, Inc., CA No. 12-78 (1978).

[13] Even if negligence could be sustained on the evidence, we are without jurisdiction to entertain such a claim. See Note 12.

8

allowed plaintiff admission to bail on sureties. This is a gross misstatement of fact based upon only half of the story. The other half is that the Appellate Division subsequently vacated its said bail order and thereby returned plaintiff to custody after he had, on May 19, 1990, skipped bail and went into hiding for nearly a month.

While a few magic phrases have thus been recited in the complaint, there has been absolutely nothing in the way of evidence to sustain the allegations arising by the use of those phrases.

II. CA No. 103-90

Here, plaintiff seeks $1 million in "general" and "special" damages against the hospital and Drs. Salamo and Noel for their failure to hire him as a dentist at the dental clinic. Plaintiff's claim is that Dr. Laumoli had promised him work which never materialized, although plaintiff ended up working five months for the hospital without pay. In support of his testimony to that effect, plaintiff submitted the aforementioned "To Whom it May Concern" letter.

Assuming arguendo that plaintiff had stated a cognizable claim for relief, such a claim is nevertheless thoroughly wanting in merit. As we noted above, no person may practice dentistry in the territory until he or she is duly licensed by the Health Services Regulatory Board. See A.S.C.A. §§ 31.1001 et seq. · It simply follows that before one can be hired as a "dentist," it behooves that person to demonstrate that he is in fact a dentist. Plaintiff could not provide the requisite proof before the Health Services Regulatory Board, nor has he attempted even in the slightest to show otherwise before this Court. According to Dr. Laumoli, the only documents plaintiff furnished him were copies of a diploma and transcripts of subjects and grades; he had advised plaintiff that he must furnish references as well as evidence of licensure in the Philippines before he, Dr. Laumoli, could make a recommendation to the hospital's medical executive committee, as well as to the Health Regulatory Board; plaintiff failed to provide those requirements.

Alternatively, plaintiff accuses Dr. Noel of discriminatory treatment by reason of his being denied a license to practice dentistry in the territory. This allegation of discrimination remains just that--an allegation without anything in the way of meaningful proofs. Rather, plaintiff seems to think, as far as we can gather from the extent of his attempted proofs together with his related questions put to Drs. Laumoli and Noel on the witness stand, that merely presenting a piece of paper,

9

albeit from an unfamiliar and unknown foreign institution, makes him a dentist. In the realm of medicine and public health care, it really takes no great imagination to appreciate why a regulatory authority would require something more in the way of establishing competence beyond a piece of paper submitted without foundation.[14]

III. CA No. 20-90

Plaintiff bases this claim, also for $1 million in "general" and "special" damages, on his contention that he was unlawfully arrested on July 12, 1988, and unlawfully detained thereafter until July 16, 1988. He argues that, at the time of his arrest and detention, he was lawfully in the territory pursuant to the work permit which the board had granted on May 6, 1998.

The claim, if it sounds in tort, is outside the scope of the G.T.L.A. Specifically, A.S.C.A. § 43.1203(b)(5) unequivocally excludes, inter alia, any claim against the government based on "false arrest" or "false imprisonment." In terms of an action based on the notion of false arrest or false imprisonment, the government remains immune from suit.

At the same time, we have searched for a constitutional dimension to plaintiff's claim; however, we are unable to conclude on the evidence that plaintiff's arrest on July 12, 1988, was otherwise than lawful. Rather, the evidence showed that he was an overstayer at the time of his arrest because he was effectively without a sponsor and therefore was only entitled to remain in the territory for a period of ten days following the revocation of sponsorship. See A.S.C.A. § 41.0408(i). He was duly warned by the Immigration Office, but he chose to ignore that warning; accordingly, he was arrested and taken into custody on July 12, 1988.

Notwithstanding the facts, plaintiff nevertheless argues that he was not an overstayer on the following simplistic reasoning: his file with the immigration office failed to disclose any paperwork relating to the termination of Talamaivao's sponsorship; therefore, Talamaivao was

---

[14] The requirements for licensure are to be found in the provisions of A.S.C.A. §§ 31.1001 et seq., and the regulations contained in A.S.A.C. §§ 31.0401 et seq.

always his sponsor; the corollary to this proposition is that Katina was never his sponsor and therefore was never in a position to make plaintiff an overstayer by withdrawing his sponsorship. This argument only serves to reinforce the suggestion of frivolity in these matters--plaintiff had already admitted to the Immigration Office that Talamaivao was leaving the territory for an indefinite term and that he would no longer be eligible to continue as his sponsor. See A.S.C.A. § 41.0408(f) (the indefinite departure of a person's sponsor is a ground for revoking that person's permit).

Plaintiff also questioned the lawfulness of an arrest made without the authority of a warrant issued by the Attorney General. Plaintiff, apparently under the impression that an arrest can only be made upon a warrant issued by the Attorney General, referred us to the provisions of A.S.C.A. § 41.0610 and A.S.A.C. § 41.0227. This impression is mistaken. In addition to A.S.C.A. § 41.0610, the code also authorizes warrantless arrests, provided that the person making the arrest applies immediately thereafter "to a member of the board for an order of arrest and commitment, until the board's next meeting. . ." See A.S.C.A. § 41.0510(c). Furthermore, the regulation A.S.A.C. § 41.0227 (derived from Immigration Regulations effective prior to 1975) is no longer on the books as the result of subsequent amendments to the rules.

We find no merit in these matters.

On the foregoing, judgment will enter for the defendants and each of them.

It is so ordered.